**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE APPLICATION OF CABLE NEWS NETWORK, INC. TO UNSEAL COURT RECORDS | Misc. Case No.: 1:26-mc-00152-CKK |

**RESPONSE OF RESPONDENT DANIEL RICHMAN TO THE GOVERNMENT'S OPPOSITION TO CABLE NEWS NETWORK, INC.'S APPLICATION TO UNSEAL COURT RECORDS**

KKL LLP
350 Fifth Avenue, 77th Floor
New York, NY 10118
Tel.: (212) 390-9550

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street NW, Suite 400
Washington, DC 20036
Tel.: (212) 326-7900

*Attorneys for Respondent Daniel Richman*

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ................................................................................................................... 1

I. GRAND JURY SECRECY LIKELY DOES NOT JUSTIFY *EX PARTE* SEALING ........ 1

A. The Sealed Records Are Likely Not Subject to Rule 6(e) ..................................... 4

B. Much Information about the Government's Investigations Is Public ..................... 6

C. Even If the Sealed Records Are Appropriately Sealed Vis-à-Vis the Public, the Government Must Separately Justify Treating Them as *Ex Parte* ......................... 7

II. THE GOVERNMENT'S HISTORY OF MISCONDUCT JUSTIFIES HEIGHTENED SCRUTINY AND TRANSPARENCY WITH RESPECT TO THE GOVERNMENT'S HANDLING OF THE COVERED MATERIALS ........................................................... 8

III. THE GOVERNMENT'S RECENT ATTEMPTS TO "INVESTIGATE" AND OBTAIN EVIDENCE FROM PROFESSOR RICHMAN SUGGEST HARASSMENT, NOT THE CONDUCT OF A LEGITIMATE INVESTIGATION..................................................... 10

A. Potential Government Misconduct in Service of Grand Jury Process ................. 10

B. Significant Irregularities Regarding Professor Richman's Status and a Grant of Immunity ........................................................................................................ 14

1. Counsel's Call with Joseph diGenova, Counselor to the United States Attorney General ........................................................................................ 14

2. Subsequent Communications with DOJ and Irregularities Regarding a Grant of Immunity ........................................................................................ 15

CONCLUSION ............................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cowles Publ'g Co. v. Murphy*,
637 P.2d 966 (Wash. 1981) ....................2

*CNN v. FBI*,
984 F.3d 114 (D.C. Cir. 2021)....................2

*EEOC v. Nat'l Children's Ctr., Inc.*,
98 F.3d 1406 (D.C. Cir. 1996)....................3

*Globe Newspaper Co. v. Superior Ct.*,
457 U.S. 596 (1982)....................3, 4

*In re Application for Access to Certain Sealed Warrant Materials*,
2019 WL 2184825 (D.D.C. May 21, 2019). ....................4

*In re Application of Leopold to Unseal Certain Elec. Surveillance Applications & Ords.*,
964 F.3d 1121 (D.C. Cir. 2020)....................2, 4

*In re Application of New York Times Co. for Access to Certain Sealed Ct. Recs.*,
585 F. Supp. 2d 83 (D.D.C. 2008) ....................3

*In re Grand Jury Subpoenas*,
2025 WL 294956 (D.D.C. Jan. 24, 2025) ....................2

*In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*,
823 F. Supp. 3d 1 (D.D.C. 2026) ....................5

*In re Los Angeles Times Commc'ns LLC*,
28 F.4th 292 (D.C. Cir. 2022) ....................2, 6

*In re New York Times Co.*,
2021 WL 5769444 (D.D.C. Dec. 6, 2021) ....................4

*In re New York Times Co.*,
657 F. Supp. 3d 136 (D.D.C. 2023) ....................5

*In re Press Application for Access to Jud. Recs. Ancillary to Certain Grand Jury Proc. Concerning Former Vice President Pence*,
678 F. Supp. 3d 135 (D.D.C. 2023) ....................4

*In re Press Application for Access to Jud. Recs. in Case No. 23-SC-31*,
704 F. Supp. 3d 161 (D.D.C. 2023)....................2, 3

*In re Sealed Case No. 98-3077*,
151 F.3d 1059 (D.C. Cir. 1998).....8

*In re Search of One Device & Two Individuals under Rule 41*,
784 F. Supp. 3d 234 (D.D.C. 2025)..... passim

*In re Application of United States for an Ord. Pursuant to 18 U.S.C. 2705(b)*,
166 F.4th 173 (D.C. Cir. 2026).....5

*Jibril v. Mayorkas*,
101 F.4th 857 (D.C. Cir. 2024).....7

*Khalid v. Transp. Sec. Admin.*,
172 F.4th 866 (D.C. Cir. 2026).....7, 8

*Labow v. United States Dep't of Justice*,
831 F.3d 523 (D.C. Cir. 2016).....5

*Metlife, Inc. v. Financial Stability Oversight Council*,
865 F.3d 661 (D.C. Cir. 2017).....3

*Murray v. United States*,
487 U.S. 533 (1988).....10

*People v. Barnes*,
41 N.E.3d 336 (N.Y. 2015).....12

*Press–Enterprise Co. v. Superior Ct.*,
478 U.S. 1 (1986).....3

*Richman v. United States*,
350 F.R.D. 401 (D.D.C. 2025)..... passim

*United States v. Comey*,
No. 1:26-cr-00229-TNM (D.D.C. Oct. 5, 2025).....7

*United States v. Comey*,
No. 4:26-CR-16-FL-RN (E.D.N.C. Apr. 28, 2026).....7

*United States v. Hubbard*,
650 F.2d 293 (D.C. Cir. 1980).....2, 3

*United States v. Jackson*,
2021 WL 1026127 (D.D.C. Mar. 17, 2021).....5

*United States v. Johnson*,
184 F.4th 662 (D.C. Cir. 2026).....10

*United States v. Ramos*,
537 F.3d 439 (5th Cir. 2008) ....................15

*United States v. Turner*,
936 F. 2d 221 (6th Cir. 1991) ....................15

*Washington Post v. Robinson*,
935 F.2d 282 (D.C. Cir. 1991)....................3

**Statutes, Rules, and Regulations**

Fed. R. Crim. P. 6(e) .................... passim

**Other Authorities**

D.C. R. Pro. Conduct 4.2 ....................11

U.S. Dep't of Justice, Justice Manual § 9-11.150 ....................15, 16

U.S. Dep't of Justice, Justice Manual § 9-11.151 ....................14, 16

U.S. Dep't of Justice, Justice Manual § 9-11.154....................16

U.S. Dep't of Justice, Justice Manual § 9-13.200....................11

U.S. Dep't of Justice, Justice Manual § 9-13.410....................15

## PRELIMINARY STATEMENT

Pursuant to the Court's October 29, 2026 minute order, Professor Daniel Richman submits this response to the government's opposition to the application of Cable News Network, Inc. (ECF No. 1, the "Application") to unseal court records in *Richman v. United States*, 1:25-mc-00170-CKK (the "Rule 41(g) Proceeding"). Having access to neither the records in question (the "Sealed Records") nor the government's "concurrently-filed supplemental ex parte sealed memorandum" (ECF No. 6, the "Sealed Opposition"), Professor Richman cannot take a position on the Application and requests that he be granted access to the Sealed Records and Sealed Opposition, at least in redacted form, to allow him to provide a considered view of the Application.

Based on the limited information presently available to Professor Richman, there are nonetheless several reasons why sealing—or at least *ex parte* treatment—of the Sealed Records is likely unwarranted. First, there is a significant possibility that grand jury secrecy is not a sufficient justification for *ex parte* treatment or sealing. Second, the government's past misconduct with respect to the materials at issue in the Rule 41(g) Proceeding (the "Covered Materials")—to which Professor Richman assumes the Sealed Records relate—warrants heightened judicial and public scrutiny over the government's handling of the Covered Materials. Third, recent actions by the government suggest that the government's interest in the Covered Materials is not related to a viable investigation but instead part of a harassment campaign, which undermines any law enforcement interest the government may have in sealing.

## ARGUMENT

### I. GRAND JURY SECRECY LIKELY DOES NOT JUSTIFY *EX PARTE* SEALING

The Court should not defer to the government's contention that the Sealed Records "are all grand jury or ancillary grand jury materials and accordingly protected from public disclosure."

Opp. at 1. There are several reasons to think that grand jury secrecy does not justify sealing, let alone *ex parte* treatment, of the Sealed Records.

The government does not appear to contest that the Sealed Records implicate both a common law and First Amendment right of access. *Id.* (arguing that grand jury secrecy "*displaces* any First Amendment or common law right of access to subpoenas and other ancillary documents" (quoting *In re Grand Jury Subpoenas*, 2025 WL 294956, at *2 (D.D.C. Jan. 24, 2025)) (emphasis added)). A common law right of access attaches to all "judicial records," which the D.C. Circuit defines as documents intended to "influence a judge's decision-making." *CNN v. FBI*, 984 F.3d 114, 118 (D.C. Cir. 2021). Examples of judicial records include legal briefs (like the Sealed Opposition), court orders, and search warrant materials. *See In re Los Angeles Times Commc'ns LLC*, 28 F.4th 292, 296–97 (D.C. Cir. 2022); *In re Application of Leopold to Unseal Certain Elec. Surveillance Applications & Ords.*, 964 F.3d 1121, 1128 (D.C. Cir. 2020).

Where the common law right of access attaches, there is a "strong presumption in favor of public access to judicial proceedings," although "that presumption may be outweighed by competing interests." *Leopold*, 964 F.3d at 1127.[1] In *United States v. Hubbard*, the D.C. Circuit outlined a six-factor test for weighing these competing interests in the context of a motion to

[1] "[T]he presumption of transparency is accentuated in cases like this one where the government is a party." *In re Press Application for Access to Jud. Recs. in Case No. 23-SC-31*, 704 F. Supp. 3d 161, 169 (D.D.C. 2023) (internal quotation marks omitted). "Access to [judicial decisions about] search warrants and affidavits of probable cause can reveal how the judicial process is conducted. The procedures employed by the prosecutor and law enforcement can be evaluated." *In re Search of One Device & Two Individuals under Rule 41*, 784 F. Supp. 3d 234, 242 (D.D.C. 2025) (alteration in original) (quoting *Cowles Publ'g Co. v. Murphy*, 637 P.2d 966, 969 (Wash. 1981) (*en banc*)). Where the government's conduct raises serious questions about its good faith, "the stated need could not be more important: public confidence in 'the rule of law.'" *Id.* (quoting *Leopold*, 964 F.3d at 1127). As discussed below in Sections II and III, there are significant reasons to question the government's good faith.

unseal. 650 F.2d 293, 317–22 (D.C. Cir. 1980). As summarized by the D.C. Circuit in *Metlife, Inc. v. Financial Stability Oversight Council*, these factors are:

> (1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings.

865 F.3d 661, 665 (D.C. Cir. 2017) (quoting *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996)). "A seal may be maintained only if the district court, after considering the relevant facts and circumstances of the particular case, and after weighing the interests advanced by the parties in light of the public interest and the duty of the courts, concludes that justice so requires." *Id.* at 665–66 (internal quotation marks omitted).

The First Amendment protects the public's right of access to criminal proceedings and related court documents. *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 603–04 (1982); *Washington Post v. Robinson*, 935 F.2d 282, 287–88 (D.C. Cir. 1991). In determining whether a First Amendment right of access applies, courts consider two factors: (1) "whether the place and process have historically been open to the press and general public," and (2) whether "public access plays a significant positive role in the functioning of the particular process in question." *Press–Enterprise Co. v. Superior Ct.*, 478 U.S. 1, 8 (1986). As with the common law right of access, documents that implicate a First Amendment right of access can include court orders and warrant materials.[2] *See In re Search of One Device & Two Individuals*, 784 F. Supp. 3d at 251–52. When

---

[2] The D.C. Circuit has not directly addressed whether the First Amendment provides a qualified right of access to Rule 41 search warrants. But there is support in this District for concluding that "routine historical practice" weighs in favor of such a right, as does the fact that there is a common law tradition of access to such materials. *See In re Application of New York Times Co. for Access to Certain Sealed Ct. Recs.*, 585 F. Supp. 2d 83, 88 (D.D.C. 2008). *But see In re Press Application for Access to Jud. Recs. in Case No. 23-SC-31*, 704 F. Supp. 3d at 173. This qualified right of access has been found even in the context of an ongoing investigation,

the First Amendment provides a right of access, that access may be restricted only if the government demonstrates a compelling governmental interest and the restriction is narrowly tailored to serve that interest. *Globe Newspaper Co.*, 457 U.S. at 606–07.

When there is a qualified right of access either under the common law or the First Amendment but the government nonetheless seeks to justify continued sealing, the government must use redactions—not total sealing—if those redactions will adequately address its countervailing concerns. *See In re Search of One Device & Two Individuals*, 784 F. Supp. 3d at 244; *In re Press Application for Access to Jud. Recs. Ancillary to Certain Grand Jury Proc. Concerning Former Vice President Pence*, 678 F. Supp. 3d 135, 143–47 (D.D.C. 2023); *accord In re New York Times Co.*, 2021 WL 5769444, at *9 (D.D.C. Dec. 6, 2021); *In re Application for Access to Certain Sealed Warrant Materials*, 2019 WL 2184825, at *3 (D.D.C. May 21, 2019).

### A. The Sealed Records Are Likely Not Subject to Rule 6(e)

The government cites Rule 6(e) of the Federal Rules of Criminal Procedure as the basis for sealing. Opp. at 1. While sealing may be justified if the Sealed Records are, in fact, subject to Rule 6(e), the Court should scrutinize the government's contention critically.

Under the common law right of access, the *Hubbard* test is displaced when Congress has specifically spoken to sealing. *Leopold*, 964 F.3d at 1129. Consequently, materials that fall within Rule 6(e)'s ambit may be immune from public access, but only to the extent "necessary to prevent the unauthorized disclosure of a matter occurring before the grand jury." *Id.* at 1130 (quoting Fed.

---

absent a particularized need for sealing. *In re Search of One Device & Two Individuals*, 784 F. Supp. at 247–252. This makes good sense and is not a conclusion that all warrants in all cases are subject to public access. This is because finding a qualified right to access is only the first part of the analysis—warrants in a given matter will remain under seal if the government can demonstrate a compelling governmental interest and that the requested sealing is narrowly tailored (*i.e.*, that any information that can be unredacted and made public has been).

R. Crim. P. 6(e)). Moreover, Rule 6(e)'s protections apply only to materials "relating to grand jury proceedings," Fed. R. Crim. P. 6(e), a term that is broad but not boundless. Similarly, while there is no First Amendment right of access to materials protected by Rule 6(e), *In re Application of United States for an Ord. Pursuant to 18 U.S.C. 2705(b)*, 166 F.4th 173, 179 (D.C. Cir. 2026), this principle applies only to materials that are, in fact, subject to Rule 6(e).

Materials are covered by Rule 6(e)(6) when they would "tend to reveal some secret aspect of the grand jury's investigation, such as information about grand jury witnesses, testimony, or investigative strategy." *Id.* at 178 (internal quotation marks omitted). But "just because an exhibit *is* presented to a grand jury, or *may* be . . . does not cloak the material with secrecy or prompt the policy concerns animating such secrecy." *United States v. Jackson*, 2021 WL 1026127, at *7 (D.D.C. Mar. 17, 2021). "Rule 6(e) does not draw a veil of secrecy over all matters occurring in the world that happen to be investigated by a grand jury." *Labow v. United States Dep't of Justice*, 831 F.3d 523, 529 (D.C. Cir. 2016) (internal quotation marks omitted). Thus, for example, "[s]earch warrants . . . are not subject to Rule 6(e), even when the warrant is issued to obtain evidence as part of an ongoing grand jury investigation." *In re New York Times Co.*, 657 F. Supp. 3d 136, 144 n.6 (D.D.C. 2023), *vacated on other grounds*, 2024 WL 1739096. While the government appears to argue that materials "ancillary" to grand jury proceedings are categorically immune from disclosure, Opp. at 1, the government's own authority makes clear that is simply incorrect. *See In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 823 F. Supp. 3d 1, 15 (D.D.C. 2026) (observing that "ancillary proceedings' records" are sealed under Rule 6(e) only "to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury" and that "briefs" and "resulting opinions" in ancillary proceedings "are

presumptively accessible to the public" (citation modified)), *reconsideration denied*, 2026 WL 1224046 (D.D.C. Apr. 3, 2026).

**B. Much Information about the Government's Investigations Is Public**

In addition to assessing the applicability of Rule 6(e), the Court should consider the extent to which information in the Sealed Records is already public. "When facts are already publicly known . . . they lose . . . [Rule] 6(e) protection." *Id.* As for non-Rule 6(e) material, when applying the *Hubbard* factors, it is appropriate to consider "media reporting relating to the [government's] investigation" and whether the target of that investigation has publicly acknowledged it, both of which militate in favor of disclosure. *In re Los Angeles Times Commc'ns LLC*, 28 F.4th at 298. Where the government seeks to justify sealing based on potential harm to an ongoing investigation, it must offer more than generalizations or a "paranoid fever dream." *See In re Search of One Device & Two Individuals*, 784 F. Supp. 3d at 243–44.

It is likely that the purported grand jury material in the Sealed Records concerns an investigation (or investigations) into James Comey, to whom Professor Richman served as a counsel beginning in May 2017. Prior to the Rule 41(g) Proceeding, the government searched the Covered Materials in connection with an investigation and now-dismissed prosecution of Mr. Comey. *See Richman v. United States*, 350 F.R.D. 401, 416–17 (D.D.C. 2025). And in briefing during the Rule 41(g) Proceeding, the government opposed the return of the Covered Materials to Professor Richman on the basis that doing so would "attack an impending federal prosecution" of Mr. Comey. Mot. to Dissolve Temporary Restraining Order at 17, *Richman v. United States*, 1:25-mc-00170-CKK (Dec. 9, 2025) (internal quotation marks omitted), ECF No. 13.

The government's investigations and prosecutions of Mr. Comey have been well-publicized. Since the Rule 41(g) Proceeding, the government has indicted Mr. Comey in the Eastern District of North Carolina for alleged threats made against President Trump relating to his

posting of a photograph of seashells, and purported to charge Mr. Comey by filing a waiverless information in this District asserting violations of the Espionage Act related to allegations of unlawful transmission of national defense information to a journalist in October 2016. *See* Indictment, *United States v. Comey*, No. 4:26-CR-16-FL-RN (E.D.N.C. Apr. 28, 2026), ECF No. 1; Criminal Information, *United States v. Comey*, No. 1:26-cr-00229-TNM (D.D.C. Oct. 5, 2025), ECF No. 1. In addition to these cases, two ongoing grand jury investigations involving Mr. Comey have been reported in the press: (1) an investigation out of this District related to the alleged disclosure of classified information to journalists in April 2017 (which is related to the pending case against Mr. Comey in this District); and (2) an investigation out of the Southern District of Florida concerning a so-called "grand conspiracy" against President Trump.[3] Information disclosing the existence of these investigations should not be sealed.

### C. Even If the Sealed Records Are Appropriately Sealed Vis-à-Vis the Public, the Government Must Separately Justify Treating Them as *Ex Parte*

Nonetheless, even if sealing is warranted, "*[e]x parte* submissions generally are disfavored because they conflict with a fundamental precept of our system of justice: a fair hearing requires a reasonable opportunity to know the claims of the opposing party and to meet them." *Jibril v. Mayorkas*, 101 F.4th 857, 866 (D.C. Cir. 2024) (internal quotation marks omitted); *see also Khalid v. Transp. Sec. Admin.*, 172 F.4th 866, 872 (D.C. Cir. 2026) ("Only in the most extraordinary

[3] *See* Alan Feuer, *Justice Dept. Mulled Naming The Times as Conspirator in Comey Leak Case*, N.Y. Times (Nov. 8, 2026), https://www.nytimes.com/2026/11/08/us/politics/justice-dept-new-york-times-comey-leak.html; Ryan J. Reilly, *James Comey Subpoenaed in Trump-appointed Prosecutor's 'Grand Conspiracy' Probe*, NBC News (Mar. 19, 2026), https://www.nbcnews.com/politics/justice-department/fbi-james-comey-subpoena-trump-prosecutor-grand-conspiracy-probe-rcna264356. Public reporting regarding the grand conspiracy investigation has also disclosed the issuance of a grand jury subpoena to Professor Richman. Alan Feuer, *Justice Dept. Issues Grand Jury Subpoena to Comey Confidant*, N.Y. Times (Aug. 31, 2026), https://www.nytimes.com/2026/08/31/us/justice-department-subpoena-james-comey-richman-trump.html. That subpoena is discussed further below in Section III.

circumstances does our precedent countenance court reliance upon *ex parte* evidence to decide the merits of a dispute." (internal quotation marks omitted)). To justify an *ex parte* submission, the government must demonstrate that "a compelling interest exists." *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1075 (D.C. Cir. 1998).

While the government likely points to the secrecy of grand jury proceedings as the compelling interest at stake, the Court should treat that contention with skepticism. As discussed above, it is not clear that the Sealed Records are in fact entitled to protection as grand jury material. But even if they are, the Court should ensure that the reasons for sealing the documents vis-à-vis the public also justify depriving Professor Richman of the documents. For example, to the extent the Sealed Records are sealed to protect Professor Richman's interests (*e.g.*, his reputation, evidentiary privileges, or sensitive personal matters), there is no basis to withhold them from him.

Withholding the Sealed Records and Sealed Opposition from Professor Richman also renders him unable to meaningfully evaluate the propriety of sealing. Without access to these materials, Professor Richman can only guess at what the Sealed Records are or what basis the government has for sealing them. The opportunity to review these materials—even in redacted form—would enable Professor Richman to offer a more considered view on unsealing.

## II. THE GOVERNMENT'S HISTORY OF MISCONDUCT JUSTIFIES HEIGHTENED SCRUTINY AND TRANSPARENCY WITH RESPECT TO THE GOVERNMENT'S HANDLING OF THE COVERED MATERIALS

When considering the government's handling of the Covered Materials, the Court does not start with a blank slate. Last December, the Court found that the government illegally searched and retained the Covered Materials. *See Richman*, 350 F.R.D. at 416–18. Specifically, the Court concluded that "in September 2025, the Government directed one of its agents to review a 'full' extraction of the data from [Professor] Richman's cell phone and tablet to search for messages that [Professor] Richman exchanged with Mr. Comey." *Id.* at 417. The Court found this search to be

"manifestly unconstitutional." *Id.* Furthermore, the Court found that the government's unlawful search destroyed the government's justification for retaining any of the Covered Materials. As the Court explained, the government's ability to maintain copies of digital evidence after closing an investigation is premised on the "critical assumption . . . that the [g]overnment will maintain such files with effective safeguards against warrantless searches." *Id.* Because the government failed to do so, the Court found that "the [g]overnment's retention of [Professor] Richman's files amount[ed] to an ongoing unreasonable seizure." *Id.* at 418. Stated otherwise, if left to its own devices, the government could not be trusted to comply with the Fourth Amendment in its handling of the Covered Materials. Accordingly, the Court ordered the government to return or destroy all copies of the Covered Materials, except for one copy that the government could deposit, under seal, in the U.S. District Court for the Eastern District of Virginia, for future access pursuant to a lawful warrant and judicial order. *Id.* at 425; *see also* Order, *Richman v. United States*, 1:25-mc-00170-CKK (Jan. 27, 2026), ECF No. 50.

This history merits heightened scrutiny of any access by the government to the Covered Materials. As noted above in Section I, and for the reasons set forth below in Section III, documented, non-speculative concerns about the government's good faith magnify the need for transparency and accountability. While this is true as to the general public, it is especially true as to Professor Richman, who has a unique interest in protecting his own privacy and constitutional rights, which the government previously violated. As the Court found in the Rule 41(g) Proceeding, the Covered Materials constitute "a complete record of [Professor] Richman's electronic life up to the date" they were seized. *Richman*, 350 F.R.D. at 407–08 (quoting Professor Richman's brief). They include "privileged material," "sensitive correspondence related to student

and faculty appointments, [Professor] Richman's personal photographs, his personal medical information, and all of his application data." *Id.* at 407.

Of particular concern is the possibility that the government will use or has used the fruits of its past Fourth Amendment violations to obtain a new search warrant. "Under the 'independent source' doctrine, [a] second search is 'genuinely independent' only if (1) the [government's] 'decision to seek the warrant was [not] prompted by what [it saw] during the initial' unlawful search, and (2) no information obtained during that first search 'was presented to the Magistrate and affected his decision to issue the warrant.'" *United States v. Johnson*, 184 F.4th 662, 672 (D.C. Cir. 2026) (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)) (third alteration in original). Given Professor Richman's familiarity with the Covered Materials and the history of the government's access to them, Professor Richman is uniquely situated to identify reliance on unlawfully obtained evidence in any warrant application.

## III. THE GOVERNMENT'S RECENT ATTEMPTS TO "INVESTIGATE" AND OBTAIN EVIDENCE FROM PROFESSOR RICHMAN SUGGEST HARASSMENT, NOT THE CONDUCT OF A LEGITIMATE INVESTIGATION

Events occurring since the Rule 41(g) Proceeding cast further doubt on the government's good faith. Two months ago, the government subpoenaed Professor Richman to testify before a grand jury in the Southern District of Florida in connection with the government's grand conspiracy investigation. The government's decision to compel Professor Richman's appearance, the manner in which it attempted to "serve" him, and its apparent pursuit of facially baseless charges against him all suggest harassment, not a legitimate grand jury investigation.

### A. Potential Government Misconduct in Service of Grand Jury Process

On the afternoon of Thursday, August 27, 2026, a Miami-based FBI agent ("MF") contacted counsel for Professor Richman to arrange service of a subpoena seeking Professor Richman's testimony before a grand jury in Fort Pierce, Florida on September 10, 2026 (the

"Subpoena"). *See* Lewin Decl. ¶ 3. The following day, counsel informed the FBI that he would accept service of the Subpoena on behalf of Professor Richman and, just after noon, FBI Agent MF confirmed the same in writing: "Thank you so much for returning my call and accepting service of the subpoena on behalf of Mr. Richman." *Id.* ¶ 4; Ex. A. A few hours later, counsel re-confirmed in writing his acceptance of the Subpoena on behalf of Professor Richman. *See* Ex. A.

Less than one hour after Agent MF confirmed acceptance of the Subpoena, he called counsel and, without any explanation, said that he wanted to arrange for in-person service of Professor Richman. *See* Lewin Decl. ¶ 5. Shortly thereafter, and without notice to counsel, Agent MF called Professor Richman directly. *Id.* ¶ 6. Two days later, on the morning of Sunday, August 30, a second FBI agent, this one based in New York ("JR"), called Professor Richman directly; she left a message saying: "I would like to speak with you." *Id.* ¶ 7. Hours later, a third FBI agent ("RJ") left a voicemail for Professor Richman's counsel, saying that he wanted to "clarify some details in terms of conversations you've had with some of my colleagues over the last few days." *Id.* ¶ 8. Counsel called right back and complained to FBI Agent RJ about the improper attempts to communicate with Professor Richman—a represented party—and to reiterate that counsel had already accepted service of the Subpoena. *Id.* ¶ 9. Agent RJ said that his "chain of command" had "directed" that the FBI serve Professor Richman in person, and he threatened that FBI agents would wait outside Professor Richman's personal residence until personal service was effected. *Id.* Counsel reiterated that the Subpoena had already been served and that attempts to contact Professor Richman directly were flatly inappropriate. *Id.*; *see also* U.S. Dep't of Justice, Justice Manual § 9-13.200 (governing communications with represented persons); D.C. Rule of

Professional Conduct 4.2 (governing communications with represented persons, including causing others to communicate with represented persons).

The same day, Sunday, August 30, Agent RJ and at least one other FBI agent came to Professor Richman's building and told the building staff that they had "instructions to deliver something to someone" in Professor Richman's apartment. *Id.* ¶ 10. Professor Richman was out of town at the time. *Id.* The building staff told the agents to contact Professor Richman's lawyer, in response to which the agents admitted that they already had. *Id.* The building staff said that the agents could not go upstairs to the non-public spaces within the cooperative building to gain direct access to Professor Richman's apartment. *Id.*; *cf. People v. Barnes*, 41 N.E.3d 336, 339 (N.Y. 2015) (observing that, under New York trespass law, "common areas" of multi-unit buildings "may be restricted from public use"). In response, one of the agents said that they were "under instructions that if people don't let us up, they're going to be charged with obstruction." *Id.* After further discussion between the agents and a building staff member, the agents eventually agreed to have the staff member confirm that Professor Richman was not in his apartment, which he did, whereupon the agents departed. *Id.*

The conduct of the government in repeatedly and aggressively attempting to directly contact Professor Richman—purportedly to "serve" a subpoena that had already been served—and threatening building employees with obstruction of justice for refusing to permit them to access non-public spaces in a residential building to which they, in these circumstances, had no right of access, raises significant questions regarding the true purpose of this activity—and, specifically, whether it was in fact an attempt to harass or embarrass Professor Richman, to initiate an uncounseled communication, or both. These questions were amplified by the bizarre explanations offered days later to Professor Richman's counsel by Joseph diGenova, Counselor to

the Attorney General. *See infra* Section III.B.1 (Mr. diGenova claimed that the grand jury, itself, requested personal service of the Subpoena).

Further demonstrating the government's lack of good faith vis-à-vis Professor Richman, the government is apparently exploring potential obstruction charges against Professor Richman based on his supposed "evasion" of personal service of the Subpoena. On September 9, 2026, the day before Professor Richman's testimony, a government prosecutor advised Professor Richman's counsel that the government's attempt at "service" was one of the issues the grand jury was investigating. Lewin Decl. ¶ 21. Indeed, while in the grand jury waiting room in the federal courthouse in Fort Pierce on September 10, two employees of Professor Richman's residential building staff were also present having themselves received subpoenas to provide grand jury testimony. *See id.* ¶ 22.

An obstruction charge against Professor Richman would be patently and facially meritless. It was impossible for Professor Richman to have evaded service of a Subpoena when the agents came to his home, because his attorney had already accepted service of that Subpoena. Furthermore, Professor Richman in fact appeared and testified before the Fort Pierce grand jury on the date specified in the Subpoena, conclusively undermining any theory that he "obstructed" the grand jury's investigation by avoiding service. Particularly in light of the subsequent communications with, and conduct of, the government—described below—this activity suggests the possibility that the government is engaged in activity designed to harass, and not to carry out an investigation in good faith and in the normal course.

**B. Significant Irregularities Regarding Professor Richman's Status and a Grant of Immunity**

In a series of unsettling and irregular communications between the government and counsel for Professor Richman, the government made a variety of statements that raise further significant questions about the legitimacy of the seemingly ongoing investigation.

1. Counsel's Call with Joseph diGenova, Counselor to the United States Attorney General

On Monday, August 31, counsel left a message for Joseph diGenova, who was then in charge of the government's grand conspiracy investigation.[4] Lewin Decl. ¶ 11. Counsel and Mr. diGenova spoke the following day. *Id.* ¶ 12. During that call, in response to counsel reiterating that service of the Subpoena was accomplished days earlier and that FBI Agent MF had confirmed counsel's acceptance of service, Mr. diGenova said that was "not good enough." *Id.* Mr. diGenova then asserted that "[t]he grand jury requested that we serve [Professor Richman] personally." *Id.*; *see also generally* Fed R. Crim. P. 6(e)(2)(B)(vi) (regarding grand jury secrecy); District of Columbia Rule of Professional Conduct 4.1 (regarding truthfulness in statements to other lawyers). When counsel observed that there was no discernable basis for that, Mr. diGenova responded that "this is the first I'm hearing of the FBI saying that you could accept service of process on [Professor Richman's] behalf." Lewin Decl. ¶ 12.

---

[4] Mr. diGenova resigned from the DOJ on September 10, the day of Professor Richman's testimony, apparently while Mr. Richman was sitting outside the grand jury room. *See* Rebecca Beitsch, *Joe diGenova resigns from DOJ position investigating Trump foes*, The Hill (Sept. 11, 2026), https://thehill.com/homenews/administration/6084344-jodigenova-trump-investigation-resigned. After his resignation, Mr. diGenova told the press: "If you want indictments where there's no evidence, you have an ethical problem." *Id.*

Counsel then asked Mr. diGenova for Professor Richman's status in the investigation; Mr. diGenova responded that Professor Richman is "definitely a target."[5] *Id.* ¶ 12. When counsel inquired why Professor Richman had not been served with a target letter, as required by DOJ policy, Mr. diGenova first stated that his "team is in the process of getting onboarded and we're discussing things like that;" he then stated, "in my mind, [Professor Richman] is definitely a target, but not in the grand jury's mind; in their mind, he's a subject." *Id.*; *see also* Dep't of Justice, Justice Manual § 9-11.150 (governing the issuance of grand jury subpoenas to targets).

Mr. diGenova then said that his office was going to immunize Professor Richman via letter immunity,[6] which would, he assured, be provided before testimony. *See* Lewin Decl. ¶ 12. Counsel asked whether the prosecution team had received DOJ approval to subpoena a lawyer; Mr. diGenova said that they had not. *See id.*; *see also* Dep't of Justice, Justice Manual § 9-13.410 (requiring approval by the Assistant Attorney General or a Deputy Assistant Attorney General for the Criminal Division prior to issuance of a subpoena to an attorney).

2. Subsequent Communications with DOJ and Irregularities Regarding a Grant of Immunity

Two days later, on September 2, counsel spoke with a prosecutor on Mr. diGenova's team ("PH"). Lewin Decl. ¶ 13. PH disagreed with Mr. diGenova's assessment that Professor Richman may be a target, stating that, in his own view, Professor Richman was "obviously" a subject,

---

[5] According to the Justice Manual, "[a] 'target' is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." Dep't of Justice, Justice Manual § 9-11.151. "A 'subject' of an investigation is a person whose conduct is within the scope of the grand jury's investigation." *Id.*

[6] Letter immunity is "an agreement between [a] witness and [the] government." *United States v. Ramos*, 537 F.3d 439, 453 n.8 (5th Cir. 2008). It is narrower than immunity granted under the federal immunity statute. *See id.* at 455; *United States v. Turner*, 936 F.2d 221, 224 (6th Cir. 1991).

although he opined that there was some conduct that "could be in the realm of criminality." *Id.* PH reiterated that Professor Richman would receive letter immunity before he testified. *Id.* In response to counsel's assertion that letter immunity might not be sufficient and Professor Richman might insist on statutory immunity and thus to confirm that any such letter be provided sufficiently in advance of testimony, PH said that Professor Richman "can make an appearance, even if he invokes." *Id.* When counsel observed that DOJ policy narrowly circumscribes the circumstances in which a witness who intends to invoke should nonetheless be required to appear,[7] PH reiterated the government's intention to secure immunity prior to testimony—likely one week later, on September 8. *Id.* PH also claimed that Mr. diGenova was incorrect when he told counsel that prosecutors did not get approval to subpoena a lawyer. *Id.*

On September 8 and 9, counsel for Professor Richman followed up with PH about letter immunity, reminding him that Professor Richman needed to see the letter in advance of his testimony so that he could determine whether he would require statutory immunity. *Id.* ¶ 14.

On September 9, Professor Richman's counsel had a third conversation with the government regarding Professor Richman's status, this time with a third prosecutor ("ME"). *See id.* ¶ 15. During that conversation, ME represented that Professor Richman was "originally a target" but was not so any longer. *Id.*[8] Regarding immunity, ME stated that a proposed letter would be sent to counsel imminently, and that he believed, if necessary, that the government would be prepared to offer statutory immunity. *Id.* ME stated that he was not bringing Professor Richman

[7] *See generally* Dep't of Justice, Justice Manual § 9-11.154 (addressing advance assertions of an intention to invoke).

[8] The government never sought Professor Richman's voluntary appearance or advised him in writing of his rights, as the Justice Manual requires for targets of grand jury investigations receiving subpoenas. *See* Dep't of Justice, Justice Manual §§ 9-11.150, 9-11.151.

to Florida to have him invoke and acknowledged that it would be improper for the government to do so. *Id.*

The government did not send its proposed letter immunity agreement until 3:37 pm on September 9, the day before Professor Richman was scheduled to testify at 10:00 am in Fort Pierce. *Id.* ¶ 16. Less than two hours later, Professor Richman's counsel informed the government that Professor Richman would invoke absent statutory immunity. *Id.* ¶ 17. Still obligated to appear on September 10, and having been advised that the government would endeavor to secure statutory immunity in advance of his testimony, Professor Richman and his counsel traveled from New York to Florida on September 9. *Id.* ¶ 18. Yet despite prior representations, the prosecution team ultimately did not receive DOJ approval to move for statutory immunity for Professor Richman. *Id.* ¶ 19. Professor Richman appeared, as ordered, but, after waiting for hours, exercised his Fifth Amendment privilege. *See id.* ¶ 20. His appearance was a waste of time and taxpayer dollars. And the government's refusal to offer statutory immunity raises serious questions as to whether or not they intended to comply with the terms of the letter immunity that they initially offered.

## CONCLUSION

Because the government filed the Sealed Records and Sealed Opposition *ex parte* and under seal, Professor Richman is unable to take a position on the Application and respectfully requests the opportunity to review them, at least in redacted form. In any event, the Court should carefully examine the government's justifications for sealing. Grand jury secrecy likely does not justify sealing, let alone *ex parte* treatment. And heightened scrutiny of the government's actions with respect to the Covered Materials is justified by the government's past and ongoing conduct.

In the event the Court grants the Application and the Sealed Records contain sensitive information pertaining to Professor Richman, Professor Richman respectfully requests an opportunity to review the Sealed Records and propose redactions before they are unsealed.

Dated: November 13, 2026
Washington D.C.

Respectfully submitted,

By: _/s/ Mark C. Hansen_
Mark C. Hansen

KKL LLP
Nicholas J. Lewin (*pro hac vice* forthcoming)
Celia V. Cohen (*pro hac vice* forthcoming)
Jonathan F. Bolz (*pro hac vice* forthcoming)
350 Fifth Avenue, 77th Floor
New York, New York 10118
Tel.: (212) 390-9550
Nick.Lewin@KKLllp.com
Celia.Cohen@KKLllp.com
Jonathan.Bolz@KKLllp.com

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
Mark C. Hansen
D.C. Bar No. 425930
1615 M Street NW, Suite 400
Washington, DC 20036
Tel.: (202) 326-7900
mhansen@kellogghansen.com

*Attorneys for Respondent Daniel Richman*